**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JOSEPH VANCE,      )
           )
     Plaintiff,   )  Case No.  1:09-cv-284-SJM
           )
   v.       )
           )
VISIONQUEST NATIONAL, LTD.,  )
           )
     Defendant.  )

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., Chief District J.,

  This civil action was commenced by the Plaintiff, Joseph Vance, against his former employer, VisionQuest National Ltd., following Vance's discharge from employment on November 5, 2008.  Vance's three-count Amended Complaint [Doc. No. 5] asserts violations of the Age Discrimination in Employment Act, the Pennsylvania Whistleblower Law, and the Pennsylvania Human Relations Act.  This Court's subject matter jurisdiction is premised upon 28 U.S.C. §§ 1331 and 1337, as well as 29 U.S.C. § 626(c).

  Presently pending before the Court is the Defendant's renewed motion for summary judgment on all counts.  For the reasons that follow, Defendant's motion will be granted in part and denied in part.

## I.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Country Floors, Inc. v. Partnership Composed of Gepner and Ford*, 930 F.2d 1056, 1061 (3d Cir.1990).  A material fact is one whose resolution will affect the outcome of the case under applicable law.  *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986).

Once the moving party meets its initial burden, it then becomes the non-movant's burden to demonstrate the existence of a genuine issue for trial.  *Matsushita Elec. Indus. Company v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460-461 (3d Cir.1989).  Under Rule 56(c)(1), a non-moving party asserting that a fact is genuinely disputed must support such an assertion by:  "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations…, admissions, interrogatory answers, or other materials; or (B) showing that the materials citied [by the opposing party] do not establish the absence … of a genuine dispute..." Fed. R. Civ. P. 56(c)(1).

At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party if there is a "genuine" dispute as to those facts.  *Scott v. Harris,* 550 U.S. 372, 380 (2007).   A dispute is "genuine" only if the evidence is such that a reasonable jury could find in favor of the non-moving party.  *Anderson*, 477 U.S. at 247-

249.  See *Matsushita Elec. Industrial Co.,* 475 U.S. at 586–587 ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" ).

## II.  <u>BACKGROUND</u>

VisionQuest National Ltd. (hereafter, "VQ") is a for-profit corporation headquartered in Tucson, Arizona which administers programs for troubled youth in various states across the country, including Pennsylvania.  VQ contracts with local county governments to provide housing, education, and therapies for serious juvenile offenders as an alternative to formal detention or incarceration.  VQ's campus in Franklin, Pennsylvania includes two facilities located, respectively, on Hudmont Lane and South Penn Road.

Vance was hired by VQ on November 11, 2003 as a teacher at Camp Charles Young, located at VQ's South Penn facility.  At the time of his hiring, Vance was 50 years old.  (Def.'s Concise Statement of Material Facts ("CSMF") [Doc. No. 34] at ¶ 12; Pl.'s Reply to Def.'s CSMF [Doc.No. 40] at ¶ 12.)  Vance's hiring was approved by Kenn Capper, who at that time held the position of Lodge Director.  Capper is approximately three years younger than Vance.  (Def.'s CSMF at ¶ 11; Pl.s Reply to CSMF at ¶ 11.)

The evidence in this case demonstrates that Vance had a mixed employment record while at VQ.  Included in his personnel file are various commendations but also numerous write-ups, including at least two disciplinary notices in the weeks immediately preceding his final termination.  Among other things, Vance's employment record

reveals a history of discipline and counseling with respect to his manner of communication.

Approximately six months after being hired, Vance was promoted (at the age of 51) to serve as Vice-Principal of VQ's Guided Centering Program in Franklin. Vance's promotion was initiated by Rolland "Bay" Lawrence, then Principal of the Franklin Lodge educational programs. (Def.'s CSMF at ¶ 13.) Vance acknowledges that, as Lodge Director, Capper would had to have approved this promotion. (Vance Depo., Doc. No. 35-2 at p. 18 of 136.)[1]

In the first review which Vance underwent as a Vice Principal in November 2004, Lawrence wrote that Vance was dependable and possessed a very good work ethic; however, Lawrence also felt that Vance could develop more in the area of people skills and dealing with VQ's teachers. (Doc. No. 35-2 at p. 82.) This criticism came up again in February 2005 when Vance was written up for unprofessional conduct. In a "Staff Notice" dated February 10, 2005, Lawrence reported that Vance had been "unprofessional with his approach with staff" on "numerous occasions" and had projected a condescending attitude toward female staff in particular. (Id. at p. 83.) Lawrence performed an evaluation of Vance the following month in which he reiterated that Vance loved his job, had good attendance, was dependable, and did whatever is needed but also needed to be more professional in dealing with others. (Id. at pp. 84-85.)

---

[1] All citations are to the official CM/ECF pagination appearing in the header of the cited document rather than to the document's internal pagination.

In October of 2005, Vance was terminated at the age of 52 from his Vice-Principal position after a teacher accused him of changing a student's grade. According to a report from VQ's Employee Resolution Committee, both Lawrence and Capper were involved in this adverse employment action. (Doc. No. 35-2 at p. 103.)

Following an investigation, the Employee Resolution Committee determined that there was insufficient evidence to support the charge of grade "fudging" on the part of Vance. At the same time, however, the Committee felt that Vance's "unprofessional behavior, his questionable judgment and his problematic staff relationships would be detrimental to his ability to return as a Vice-Principal," so it recommended that Vance return to VQ as a teacher. (Doc. No. 35-2 at p. 103.) Thus, although Vance was able to regain his employment, his appointment as a teacher constituted a demotion from his prior position. In addition, the Committee "strongly recommend[ed] that Mr. Vance be placed on a special evaluation to address improving his staff relationships" and that he receive professionalism training. (Id. at pp. 103-04.)

Pursuant to this recommendation, Vance was placed on a "Special Evaluation" in November of 2005. In his progress notes dated November 2, 2005 Lawrence reported that Vance's "areas for growth" included communication and professionalism. Lawrence wrote:

> You and I have previously discussed complaints from female staff about the manner in which you communicate with them. They have alleged that you speak to them in a disrespectful manner, including a raised voice, and condescending and/or sarcastic words. They believe that you treat them differently than male employees.

(Doc. No. 35-3 at p. 26.) Vance was cautioned that such perceptions put both him and VQ at risk and, therefore, it was "critical" that Vance examine the manner in which he

communicated to all employees, and "immediately make any necessary adjustments."
(Id.) Lawrence assured Vance that he would provide immediate feedback concerning
Vance's communication style and would notify him of future training to assist Vance in
improving his skills. However, Lawrence also cautioned that "another instance of
unprofessional and negative communications [would] result in corrective action, up to
and including the termination of [Vance's] employment." (Id.)

By June 2006, Vance's employment profile had improved to the point that he was
promoted, at age 53, to the position of Assistant Chief Administrator. During his tenure
as Assistant Chief Administrator, Vance served under various Top Chief Administrators,
including Anthony Wilson, Chris Perkins, and Greg Mello. Capper, meanwhile, had
been promoted to the position of State Director for VQ's Pennsylvania programs, and
Paula Harper became the new Lodge Director. Vance acknowledges that Capper was
likely involved in his promotion to Assistant Chief Administrator and would had to have
approved it. (Doc. No. 35-2 at pp. 18, 27, 44-45; Doc. No. 41-1 at pp. 30, 36.)

In connection with his promotion, Vance received a performance appraisal from
Anthony Wilson (Vance's then supervisor) and Human Resources Representative Pam
Van Ness. In this performance appraisal, dated June 15, 2006, Vance was rated in
numerous categories and his overall score placed him in the "superior" range. (Doc.
No. 35-3 at pp. 28-46.) Among the observations made by Vance's supervisor was the
comment that "Mr. Vance works well with others, is very organized and is willing to do
more without being asked." (Id. at p. 30.) It was further noted that "Mr. Vance leads by
example in a positive way," "holds his peers to a high standard," and "works hard to
retain staff." (Id. at p. 32.)

6

Over the next two and one-half years, however, Vance accumulated a series of disciplinary write-ups, including two which immediately preceded his termination. On September 5, 2006, Vance received a Staff Notice from Van Ness for violating procedures on time records by failing to properly record his work hours. (Doc. No. 35-3 at p. 56.) Vance contends that this notice involved his failure to "swipe-in" a few times while acting as the Senior Duty Officer ("SDO"). (Doc. No. 35-2 at p. 46)

Later that same month Vance was written up by Paula Mehler, VQ's Regional HR Director, for using an inappropriate restraint technique on a youth while responding to a call for assistance from another staff member. (Doc. No. 35-3 at p. 58.) The notice acknowledges that Vance's "work with the youth in this situation was commendable in that [Vance] offered [the youth] many opportunities to change his behavior without a restraint" and "exhibited a good deal of patience" in the situation. (Id.) Vance contends that this incident involved him getting hit with a club by the individual he was restraining. Vance further avers that he was subsequently cleared of any wrongdoing by the Department of Public Welfare. (Doc. No. 44-6 at ¶ 30, pp. 6-7.)

In June of 2007 Vance was again written up by Van Ness for failing to properly record his work hours. The Staff Notice indicates Vance's failure to comply with the time records policy on numerous occasions in April to June of that year. (Doc. No. 35-3 at p. 60.)

On August 23, 2007 Vance received a Staff Notice from Mehler for two violations which had occurred earlier that month. On August 12, 2007 Vance had authorized a VQ employee to relieve another staff member who wanted a break, resulting in one of

the living units being out of ratio.[2]  The following day, Vance had departed work without designating a Senior Duty Officer for the night.  (Doc. No. 35-3 at p. 62.)  As a result of these infractions, Vance was suspended without pay for one working day.  In her notice to Vance, Mehler commented, "You are a solid Chief, a highly valued member of the team, and committed to VisionQuest.  Therefore, I am confident that these issues will not be a problem again in the future."  (Id. at p. 63.)   On the notice form, Vance indicated his agreement with Mehler's statement.  (Id.)

Vance's next write-up came on June 12, 2008 from Greg Mello, who was by this time the Top Chief Administrator and Vance's supervisor.  Mello's Staff Notice indicates that Vance violated policy by asking a therapist to cover family visits, despite Vance's knowledge that the therapist was not permitted to have any type of contact with program youth because of clearance issues.  (Doc. No. 35-3 at p. 64.)  Although Vance indicated his agreement with Mello's statement on the Staff Notice, he now states that he did so only to avoid a "hassle."  Vance maintains that this situation arose out of a "Hobson's Choice" which left him with no good alternative:  *to wit*, he was required to send a VQ representative to accompany the student on his family visit but did not have enough staff on hand to do so; thus, Vance says, he could have sent a line staff member down to the family visit site, which would have resulted in one of the units being out of ratio, or he could send the therapist.  (Doc. No. 35-2 at p. 49.)  He chose the latter.

---

[2] State regulations required VQ to maintain a ratio of one staff member for every eight children during daylight hours and a 1-to-16 ratio at nighttime.  (Doc. No. 44-4 at p. 7.)

The next noteworthy development in Vance's employment record came on July 21, 2008 when Vance received a second Special Evaluation from Mello, Harper, Mehler, and Capper.  In this performance appraisal, Vance was notified that:

> [t]here have been recent complaints from several staff that you speak to them or their co-workers in a manner that they perceive as demeaning and demoralizing.  A circle with new (90 day) staff was held about three weeks ago to discuss their experiences as new hires.  The first comment made by one of these new staff was that you sometimes talk to them in a derogatory manner, and that caused one of their new co-workers to resign without notice.  Several other staff nodded in agreement and/or verbally agreed.
>
> Most recently, a more tenured staff complained to Human Resources that he considered writing his letter of resignation after you "cursed and screamed" at him.  This staff also stated that the same new staff referenced at the new hire circle resigned w/o notice because he felt belittled by your communications.
>
> Finally, a youth complained to Quality Assurance about three weeks ago that you use profanity around him and other youth.
>
> This is an issue that has been discussed with you many times during your employment with VisionQuest, and has been the topic of repeated staff complaints.

(Doc. No. 35-3 at pp. 81-82.)

The evaluation went on to note that Vance was failing to meet expectation with regard to (among other things) showing respect and interactions with co-workers.  It warned that "[a]nother validated complaint on this topic may result in demotion or termination of employment."  (Doc. No. 35-3 at pp. 81, 83.)  The notice further elaborated on Vance's performance deficiencies as follows:

> Staff and youth have complained repeatedly about your communication style.  Specifically, that on occasion you speak in a raised voice, using profanity and making demeaning statements.  Areas impacted include respect, team building, cultural diversity and retention.
>
> The last time that you met with Paula Harper and Greg Mello, you stated that you would improve in documentation.  The Clinical department has reported that they have not noted any improvements.  Last week, you were provided important clinical documentation concerning a youth.  You reported that you signed but did not read the documentation; and this documentation ended up being left in an open area and was read by other youth.

(Doc. No. 35-3 at p. 82.)  The latter reference involved a confidential report about a youth who had been subjected to sexual abuse.  According to VQ, Vance left this document in an area where other students were able to access it, resulting in the abused youth being ridiculed and further traumatized.

Vance disputes this account and claims that another VQ employee had left the materials unsecured.  Vance asserts that he found the materials in a desk drawer, did not know that they pertained to, and simply returned them to the place where he had found them.  (Doc. No. 44-6 at p. 7, ¶ 32.)

With respect to the criticisms relating to his style of communication, Vance denies yelling at his co-worker and maintains that profanity was a regular occurrence among VQ's staff.  (Doc. No. 44-6 at pp. 5-6, ¶ 25; Doc. No. 35-2 at pp. 51, 67.)  He explains the complaints by more junior staff members as resulting from the fact that he set strict standards with respect to maintaining proper staff-to-youth ratios and would chastise his subordinates when they took smoking breaks without permission, as that would leave the living unit under-staffed.  (Doc. No. 44-6 at p. 6, ¶ 26.)

The parties also offer differing interpretations as to the meaning and significance of Vance's second Special Evaluation.  According to VQ, Vance's second Special Evaluation constituted a "last chance" warning about unprofessional conduct that needed to change and was considered to be a "big deal" by Mehler, Mello, Harper and Capper.  Despite this, Vance did not even bother to read the document and, indeed, VQ claims, his work performance deteriorated even further in the months that followed.

Vance contends that his second Special Evaluation occurred in the context of evaluating whether he should be promoted to Chief Administrator II.  Vance claims that

he informed his supervisors during the meeting that he wanted to step down as Chief Administrator and become a unit director, as he was sick of being blamed for things that he felt were not his fault. He states that he was discouraged from making such a move and was told this would be a waste of his talent. (Doc. No. 35-2 at p. 54.) The evaluation documents that, across various performance categories, Vance mostly received marks indicating that he was meeting or occasionally exceeding VQ's standards, although Vance also received some marks indicating that, in certain areas (such as demonstrating respect and interacting with co-workers), he was occasionally not meeting standards. (Doc. No. 35-3 at pp. 66-80.) His overall score placed him in the category of "competent," meaning that Vance's performance met job requirements and "may exceed expectations in some areas and be deficient in others." (Id. at p. 80.) Vance claims that, following his second evaluation, he consulted with Mello almost on a weekly basis concerning his work performance and was informed that he was performing satisfactorily. (Doc. No. 35-2 at p. 54.)

There is no dispute, however, that Vance received another Staff Notice from Mello on October 1, 2008. (Doc. No. 35-3 at p. 85-86.) This time the charge was that a youth assigned to the unit which Vance was supervising had been unaccounted for throughout the day and absconded later that evening with another youth. While the search was ongoing for the runaway, Vance left the camp for the evening. The Staff Notice also charged Vance with failing to complete an entry in the Chief's Log for September 28, 2008. (Id.)

Vance disagrees with this reprimand and maintains that he did nothing in violation of applicable regulations. He states that, despite his best efforts to obtain

11

adequate coverage, VQ was understaffed on the day in question and he personally supervised Living Unit Number 3 while also administering to the camp. Vance maintains that he conducted numerous body counts throughout the day and that the youth in question was present for each one but slipped away later in the evening while Vance was handling a medical call and a visit from a probation officer. Vance maintains that he initiated VQ's procedures for runaways and left work at 11:30 p.m. after working seventeen and a half hours that day. As for his failure to properly document an entry in the Chief's Log book, Vance contends that Mello told all three Assistant Chiefs to do a better job of recording entries in the book. (Doc. No. 35-2 at pp. 55-56.)

Several days later, Vance received another Staff Notice from Mello for again failing to make proper entries in the Chief's log book on numerous occasions during the previous month. Mello commented on the notice that it had been explained on several occasions that the log was part of VQ's Plan of correction for a major incident that had occurred at the Franklin Lodge. (Doc. No. 35-3 at pp. 87-88.)

In response to this write-up, Vance indicated his disagreement. Noting that he had "always worked very hard to [do his] job in the best manner possible," Vance wrote that "it is very difficult to complete all of a chief's duties when you are in coverage every day for every shift due to lack of line staff." (Doc. No. 35-3 at p. 88; Doc. No. 35-2 at p. 55.) Nevertheless, Vance acknowledged that recording in the log book was "one of the chief['s] duties that needs to be done," and he pledged that "in the future [he would] make every attempt to remember to write in the book." (Doc. No. 35-3 at p. 88.)

Vance's final Staff Notice came on November 3, 2008 for incidents occurring that day and the previous month. The latter involved an incident on October 19, 2008 in

which Vance left a unit without supervision. The Staff Notice charged that, while Vance was out of the unit, two youths had assaulted a peer. (Doc. No. 35-3 at pp. 91-92.)

As to this incident, Vance acknowledges leaving the living unit briefly to attend to an emergency, but he denies that any assault occurred in his absence. Specifically, Vance admits that he left the living unit he was supervising for about 3 to 5 minutes in order to respond to another staff member who was in distress because she was being threatened by a youth in a nearby area. After removing that youth and returning to his own living unit, Vance found the students as he had left them – one of them sleeping and the other three quietly watching a movie. Vance contends that, about one week after this incident, one of the four students whom he had been supervising was subjected to a disciplinary action and responded by claiming to have been assaulted while Vance was out of the unit assisting his fellow employee. Vance believes this allegation of assault was a fabrication by the youth in question. (Doc. No. 44-6 at p. 7, ¶31.)

The other violation referenced in the November 3, 2008 Staff Notice concerned an incident in which Vance used profanity in front of a student whom he was supervising in Living Unit Number 2. (Doc. No. 35-3 at pp. 91-92.) Upon entering the unit, Harper heard someone utter the phrase, "Fuck that bitch." She observed Vance lying on a couch with students present in the area. Harper demanded to know who had made the statement and Vance nodded toward a maintenance worker who was also in the room, which caused the youth to start laughing. (Id. at p.92, 89.) Later that morning, Harper inquired about the incident outside the presence of students and Vance admitted to

making the statement but indicated that his profanity had not been in reference to her. (Id. at p. 90.)

In point of fact, the statement which Harper overheard Vance utter was in reference to the Nightwatch Manager who had been working on November 1, 2008 while Vance was serving as the Senior Duty Officer. According to VQ, the Nightwatch Manager complained that Vance had failed to respond to an emergency which arose that night in spite of having been paged repeatedly and despite the fact that, as SDO, Vance was responsible for spending the night on campus and responding to emergencies. When questioned by his supervisors about the incident, Vance admitted that he had turned his pager off because he wanted to sleep. (Doc. No. 35-3 at p. 89.)

Vance does not deny this incident, but he does deny that he failed to perform his duties as Senior Duty Officer. He states that:

> [b]ecause Vision Quest sought to save money by cutting night time line staffing in the Fall of 2008, the Night Watch Supervisor was assigned to a unit to maintain ratio. I informed both Greg Mello and Pam Van Ness that I would not respond to minor infractions that should have been handled by the Night Watch Supervisor ("NWS"), who could not act as NWS because the NWS was assigned to a unit. During my employment from 2005 through 2008, I performed senior duty officer night time duties on at least 150 to 200 occasions. During those years of performance, I never missed a call concerning an infraction.

(Doc. No. 44-6 at pp. 7-8, ¶ 33.) With respect to his decision to turn his radio off, Vance maintains that he waited until 10:30 p.m., called each unit to make sure that all the kids were down for the night, then turned his radio off to sleep because he was going to have to work two double shifts in a row. (Doc. No. 35-2 at p. 58.)

Vance claims that, following a meeting with his supervisors concerning the November 3, 2008 Staff Notice, he was informed that the incident would not result in his

14

termination.  (Doc. No. 44-6 at p. 1, ¶ 4.)  Rather, he was told he would be suspended for one day without pay which, Vance claims, was to occur one week later due to staffing shortages.  (Id. at ¶ 4; Doc. No. 35-3 at p. 92.)

Nevertheless, on November 5, 2008, Vance was terminated from his employment at the age of fifty-five.  Included in the record is a document entitled "Reasons for Termination."  (Doc. No. 35-3 at pp. 89-90.)  According to this document, which Vance denies ever receiving, the incidents that resulted in his termination were: (1) the October 19, 2008 incident in which Vance left youth alone in a living unit without staff supervision, allegedly resulting in a student-on-student assault; (2) the November 1, 2008 incident in which Vance, while acting as SDO, turned off his radio and failed to respond to repeated pages by the Nightwatch Manager; and (3) the November 3, 2008 incident in which Vance was overheard to say, "Fuck that bitch" in the presence of youth and then untruthfully suggested that the maintenance worker had been the one using profanity.  (Id.)  The record supports a finding that Capper, Harper, Mello, and Mehler all had input into VQ's decision to discharge Vance.  (Doc. No. 35-4 at p. 6; Doc. No. 41-1 at p. 36.)

Vance contends that, throughout the course of his employment with VQ, he was subjected to harassment and ageist comments, primarily at the hands of Capper, who at all times had supervisory authority over him.  Vance contends that his termination on November 5, 2008 was motivated by his age and/or because of repeated complaints he made concerning VQ's failure to comply with state-mandated staffing ratios.

Set forth in the record are various emails and notes sent or copied to Vance by Capper and/or Vance's summarization of written communications which he claims to

15

have received from Capper. Many of these involve the subject of aging, Vance's weight, and/or his declining mental and physical condition. Among those communications which Vance has documented, or claims to have received, are the following:

- a note which Vance allegedly found taped to his office door after being out of work for two days with kidney stones; on the paper was the West Virginia University Competition creed with Capper's remarks (i) that Vance did not meet the conditions of the creed, (ii) that, because of his age, Vance's body was "breaking down," and (iii) that Vance was an example of how, "when a person gets old," he needs to "cowboy up" and do his job (Doc. No. 46-2 at p. 28);

- an email sent by Capper after Vance declined to go on a hike with him; according to Vance, Capper's email stated that Vance was "too old to cut it," that Capper could not look up to "an old man like [Vance] who can't do his job," and that Vance needed to "get [his] body in battle-hardened shape like [Capper's]" (id. at p. 29);

- a note which Vance allegedly found taped to his door upon returning to work after another bout with kidney stones; this note allegedly stated that Vance "was weak and not up to the job at hand" and that "maybe if [Vance] did not have such a fat ass [he] would not be sick so much and could do [his] job" (id.);

- an email which Capper sent to Vance after the latter declined an invitation to participate in an early camp physical workout session; this email allegedly remarked that Vance "was too old to do [his job]" and that "maybe if [Vance] drank a quart of Geritol and took a handful of vitamins every day, then [he] would be able to do [his] job" (id.);

- a note allegedly taped to Vance's door depicting a man with (what Vance describes as) a "huge fat stomach" and bearing the caption, "old man Vance's ABS" (id.);

- a June 2, 2006 email from Capper to Lawrence in which Capper refers to Vance as a "beefcake mentor" and comments that Vance "continues to pack on the weight like he's trying out for a friggin Sumo wrestling camp" (Doc. 35-2 at p. 76);

- a February 9, 2007 email in which Capper responds to an email concerning shortages in coverage by remarking, "I think the first part of this message is too deep for Joe; I believe it will bring back too many haunted memories of dark nights in his past life in the 70's …." (Doc. 35-3 at p. 93);

- an April 19, 2007 email sent by Capper in response to an email entitled "Lion Illusion," in which Capper remarks that the picture "looks like Joe's ass covering up the screen" (Doc. 35-3 at p. 94);

- a May 2, 2007 email from Capper in response to a string concerning a youth whom Vance mistakenly believed was assigned to therapist Gay Carson; Capper remarks, "Joe keeps giving me bum scoop[s], in this case who the therapist was – as he gets older, much older, I think his brain is losing it's [sic] capacity to recall important info, so I'll work with him on some mind-building exercises." (Doc. No. 35-3 at p. 96);

- a May 2, 2007 email from Capper to Vance stating, "I just noticed Mark's e-mail address of Mark 'bowflex' … Joe, maybe yours should be Joefoodapottamus…" (Doc. No. 35-3 at p. 95);

- a May 9, 2007 email string in which a VQ employee inquires, at Vance's suggestion, about obtaining a "leadership bracelet" and Capper responds that Vance "got his by blowing someone up the chain…" (Doc. No. 35-3, p. 97);

- a May 16, 2007 email from Capper in response to a picture which Vance had brought into work, depicting himself in running shorts as a younger man:

    Joe, I thought I'd seen it all, but no, you always find new ways to raise the bar of decadence … having your half-naked photo floating around to the female staff on camp along with your curly hair, headband and all… the only thing you're missing is the damn knee-high aerobics socks and thong… you really do need some professional help in dealing with your apparent esteem problem with how you look now that you're a senior citizen, to the point where you've reduced yourself to digging up old photos of how you used to be. It's a sad commentary on our times that you can't be proud of how you look now – hell, Rosie O'Donnell is proud of being big, along with Kirstie Alley… look at Magic Johnson and Barry Bonds, who also suffer from being bloated – there's no shame Joe in not being able to see your toes, as long as you can just keep reliving the good old days. I would await your reply, but because you still don't know how to do that I'll just wait until I see you next. (Doc. 35-3 at p. 98);

- a February 26, 2008 email string, forwarded from Capper to Vance, depicting a cartoon of an old man and woman riding a motorcycle naked, with the captions, "Who cares how old you are, live life to the fullest …" and "No age limit to being wild…" (id. at p. 112); and

- a June 27, 2008 email string concerning a policy requiring Administrative Chiefs to carry cell phones after hours; Capper replies, "Is there any way that when Joe has the cell we can put a bloc on calling pizza delivery joints ???" (Doc. No. 35-3 at p. 113).

Also included in the record is an exchange of written notes between Vance and

Capper in which the two men comment on their respective fitness. The first note, which

was generated by Vance, contains a picture of him with the notation:

    Yes, Little Kenny it's true! There is a Fountain of Youth and here is living proof!
    So if you train real hard, and do all your push ups and eat all your vitamins every
    day you too can grow up to be big and strong like your Uncle Joe !!!

(Doc. No. 35-2 at p. 71.)  Apparently in response to this communication, Capper

sent a note to Vance, accompanied by a photo of himself in his Marine Corps

Blue Dress uniform.  The note reads:

> Joe – this photo was taken on my retirement date, 8 years ago on Memorial Day.
> You'll note how I haven't changed at all, unlike yourself with the bloated,
> supplement-induced condition that you've morphed into over the years.
>
> While you were worried about chasing a fountain of youth the last few decades
> as an Adonis looking in mirrors all the time while waiting for an opening in "That
> 70's Show," folks like Moss and I were simply busy being marines.  We trained
> for and went to combat, became real drill instructors, conducted P.T. sessions as
> a lifestyle that made us legends, and it allowed us to still become the P.T. studs
> that we are to this day.
>
> It's sad to see a senior citizen such as yourself chasing times that have passed
> you by a long time ago, and with all due respect, you're right… I wear X-large
> shirts & sweatshirts because I'm not as LARGE as you; XXL just has too much
> material covering my fit waist, whereas you probably need an XXXL just to get it
> over your non-cardio, bloated, fat-ridden beer gut which is about ready to bust
> the friggin zipper on your winter coat.
>
> Contact UPMC – they have a Valentine's Day special for gastric by-pass
> surgery… it's a start!

(Doc. No. 35-2 at pp. 72-73.)  According to Vance, this note from Capper was sent in an

envelope addressed to "Joe 'that 70's guy' Vance."  (Doc. No. 35-2 at p. 75; id. at pp.

16-17.)  Although the envelope appears to have the date "2-10-05" written on it, Vance

maintains that he received this communication at some point after his June 2006

promotion to the position of Assistant Chief Administrator.  (Id. at p. 17.)

Apart from these written communications, Vance has alleged numerous verbal

remarks as set forth in a discrimination charge which he prepared in connection with

this case.  Vance contends that the following verbal communications were made by

Capper between 2005 and 2008:

18

- on December 21, 2005, while Vance and Capper discussed their respective weightlifting workouts, Capper remarked that Vance was "too old to be lifting heavy weights" and "better be careful or [his] heart would explode" (Doc. No. 41-1 at p. 123);

- that same day Capper commented that "[a] guy as old as [Vance] should not eat so much because it looked like [he] was ready to explode" (id.);

- the following day Capper stated that Vance was "looking very old and bloated" and "should not eat so much over the holidays" (id.);

- on December 26, 2005 while discussing his new motorcycle, Capper made a comment to the effect that, if Vance ever took a ride on the motorcycle, he "would need a girdle to suck in that old gut and be able to zip up [his] jacket" (id.);

- on January 8, 2006, after receiving a "bear hug" from Capper, Vance remarked that Capper was "slipping" because Capper could no longer lift him up, to which Capper replied "that was because [Vance] was so old and fat that [Capper] couldn't get his arms around him" (id. at p. 124);

- the following day, while carrying a videotape of a football game in his back pocket, Vance heard Capper remark, "Look Bay, the old man has his porno tape in his back pocket." (id.);

- on August 22, 2006, while Vance was sitting in the hallway of a campus school, Capper commented that "if [Vance] sat there a few more months… in [his] bloated and aged condition," they would be able to "put a red suit on [him]" and he would be able to "play Santa Claus for the youth"; Capper then reportedly went on to say that Vance's "sitting around all the time had made [him] fat and old so [he] would make a perfect Santa Claus." (id.);

- on September 9, 2006, Capper announced that he and another employee were going to work out together; Capper then made a derogatory age-related remark about how Vance was not needed because he would "slow[ ] them down" (id.);

- on January 24, 2007, after Vance could not perform a dexterity test administered by Capper, Capper remarked that he "was not surprised" because Vance was an "Old Fuck" (id. at p. 125);

- during this same conversation, while Vance and Capper discussed a song that had been played during the previous night's basketball game (i.e., Bachman Turner Overdrive's "Takin' Care of Business"), Capper commented that he "was sure [Vance] knew the song because [Vance] was as old as the Hills" and "must love to watch the T.V. program 'That 70's Show'." (id.);

- on August 27, 2007, after Vance commented that he had had a great leg work out that morning, Capper replied, "That is why [your] ass is so big and fat like an old man's ass." (id. at p. 126);

- on July 12, 2008, after being invited to Capper's farm for what Vance thought would be a cook out, Vance was put to work on a neighbor's farm bailing hay and milking cows, which earned him the moniker "Mr. Green Jeans." (id.); following this incident, Vance claims he became the laughing stock of the camp for about two weeks and would be greeted as "Green Acres" or asked "if [he] had been to any cookouts lately." (id. at p. 127).

VQ's response to these allegations by and large is that the Franklin facility was a stressful place to work and that staff would blow off steam by regularly engaging in workplace banter and consensual, good-natured ribbing. VQ denies that consideration of age played any role in Vance's termination. Instead, it maintains that Vance's termination was the result of a lack of professionalism and poor job performance.

Vance also theorizes that his termination was the result of his repeated complaints concerning VQ's failure to properly staff its facilities. Vance has presented evidence supporting a finding that during the time period relevant to this litigation, VQ consistently operated in violation of state-mandated staff-to-student ratios, resulting in high staff turnover and exceedingly long work weeks for VQ's Chief Administrators. (Doc. No. 43-5 at ¶¶ 5, 10-12; Doc. No. 35-3 at p. 93.) Vance contends that he raised concerns about understaffing during conversations and encounters he had with Mello and other supervisory personnel in the context of his disciplinary write-ups. (Doc. No. 44-6 at ¶3.) He claims to have made nearly daily reports to Van Ness about the facility being "radically out of ratio, especially in the night watch." (Id. at ¶ 21.) He states that he and Mello met with Harper in the summer of 2008 to discuss how bad the situation was. (Doc. No. 35-2 at p. 21.) Perkins, one of Vance's former supervisors, corroborates the allegation that he, Vance and Mello reported staffing deficiencies to

upper management. (Doc. No. 43-5 at ¶ 13.) According to Perkins, "VisionQuest had very little interest in resolving the staffing issues." (Id.)

Following his termination, Vance dual-filed a charge of discrimination with the Pennsylvania Human Relations Commission and the EEOC on April 6, 2009. This lawsuit followed on November 10, 2009.

Following lengthy discovery, VQ sought summary judgment. VQ's pending (renewed) motion for summary judgment[3] has been fully briefed and argued and is ripe for consideration.

## III.   DISCUSSION

Vance has asserted claims under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.*, the Pennsylvania Human Relations Act, 43 Pa. Stat. §§ 951 *et seq.*, and the Pennsylvania Whistleblower Law, Act of December 12, 1986, P.L. 1559, 43 P.S. §§ 1421-1428. He contends that he was fired from his job because of his age and/or because of reports he made concerning VQ's lack of compliance with state regulations. Vance also claims that he was subjected to a hostile work environment in the form of unwelcome ageist remarks.

### A.

We first consider Vance's claims that he was subjected to age-related discrimination. The Age Discrimination in Employment Act ("ADEA")[4] makes it unlawful

---

[3] On February 23, 2012, the Court denied VQ's initial motion for summary judgment without prejudice to be reasserted following a period of additional discovery. On April 19, 2012, VQ filed a motion to reassert its request for summary judgment [Doc. No. 66]. The Court granted VQ leave to reassert its Rule 56 motion by order dated April 4, 2013 [Doc. No. 79].

for an employer to, among other things, "discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Here, Vance's age-related employment discrimination claims involve two forms of alleged discrimination – unlawful discharge from employment and work place harassment. We address each of these theories separately.

1. Vance's Claim Based on His Discharge from Employment

Vance was fired on November 5, 2008 at the age of 55. He contends that his termination was the result of ageism. VQ insists that Vance was terminated due to his history of poor performance and lack of professionalism.

Vance's ADEA claim stemming from his discharge is governed by the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).[5] *See Smith v. City of Allentown,* 589 F.3d 684, 689 (3d Cir.2009); *Fasold v. Justice*, 409 F.3d 178, 183–84 (3d Cir.2005). Under this framework, the plaintiff bears the burden of making out a prima facie case of discrimination. *Fasold,* 409 F.3d at 184. Once the plaintiff has established a prima facie case, the burden shifts to the defendant to identify a legitimate justification for the adverse employment action.

---

[4] Because our analysis of Vance's age-discrimination claim under the PHRA would in all material respects mirror our analysis of his claim under the ADEA, we will, for the sake of simplicity, address Vance's claims solely in terms of ADEA law. *See Burton v. Teleflex Inc.,* 707 F.3d 417, 432 (3d Cir. 2013) (interpreting plaintiff's age discrimination claims under the PHRA "coextensively" with her ADEA claims); *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 499 n. 3 (3d Cir.2010) (noting that it is "proper to address ADEA and PHRA age discrimination claims collectively") (alteration and internal quotation marks omitted).

[5] Although Vance posits that his discrimination claim would be viable under the "mixed-motives" framework discussed in *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989), the Supreme Court has made clear that the "mixed-motives" paradigm does not apply in ADEA cases. *See Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 175-76 (2009). Accordingly, we will treat Vance's age discrimination claim as a "pretext" claim and evaluate it only under the *McDonnell-Douglas* framework.

*Id.* If the employer satisfies that burden, the plaintiff can overcome summary judgment with evidence "that the employer's proffered rationale was a pretext for age discrimination." *Smith,* 589 F.3d at 690.

For present purposes, VQ does not dispute Vance's ability to establish a *prima facie* case of age discrimination. Rather, VQ seeks summary judgment on the theory that Vance cannot show that its legitimate, articulated basis for his discharge was a pretext for age discrimination.

To make a showing of pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Burton v. Teleflex Inc.,* 707 F.3d 417, 427 (3d Cir. 2013) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). If the plaintiff's evidence relates to the credibility of the employer's proffered justification, that evidence "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Burton,* 707 F.3d at 427 (quoting *Fuentes*, 32 F.3d at 765)). Our circuit court of appeals has explained that, "if a plaintiff has come forward with sufficient evidence to allow a finder of fact to discredit the employer's proffered justification, she need not present additional evidence of discrimination beyond her prima facie case to survive summary judgment." *Id.* (citations omitted). Rather, "the factfinder may infer from the combination of the prima facie case, and its own rejection of the employer's proffered reason, that the employer engaged in

the adverse employment action for an invidious reason." *Id.* (citations omitted). Thus, the plaintiff is not required to produce direct evidence of discriminatory intent in order to make a showing of pretext and survive a motion for summary judgment. *Id.* Nevertheless, throughout the burden-shifting exercise, it remains the plaintiff's burden to demonstrate "but for" causation, *Smith,* 589 F.3d at 691 – meaning that Vance would not have been fired from his job "but for" his age.

Here, there is no question that VQ has satisfied its burden of articulating a legitimate, nondiscriminatory reason for Vance's termination – i.e, Vance's alleged poor performance and lack of professionalism. Thus, the critical question is whether Vance has demonstrated an evidentiary basis supporting a genuine factual dispute relative to the issue of pretext. Vance's evidence of age discrimination consists of the following: (i) comments by Kenn Capper and Peter Ranalli, VQ's CEO, which Vance contends are direct evidence of ageist intent; (ii) VQ's allegedly disparate treatment of younger VQ employees whom Vance claims were otherwise similarly situated to him; and (iii) alleged inconsistencies with respect to VQ's proffered legitimate reason for firing Vance.

After careful review of the parties' briefs and the relevant portions of the evidentiary record, the Court concludes that Vance has produced sufficient evidence of age-related discrimination to overcome VQ's summary judgment motion. To reiterate, VQ does not dispute that Vance is able to make out a *prima facie* case of age discrimination. This is typically done by showing that Vance: (a) is a member of a protected group (here, individuals over 40 years of age); (b) was qualified to perform the job in question; (c) suffered an adverse employment action; and (d) was replaced by another individual sufficiently younger as to permit an inference of age discrimination.

*See Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1108 (3d Cir.1997) (en banc);

*Hill v. Borough of Kutztown,* 455 F.3d 225, 247 (3d Cir. 2006). The establishment of a

prima facie case alone creates a permissible, albeit somewhat weak, inference of age

discrimination. *See Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061, 1084

(3d Cir. 1996) (Alito, Circuit J., concurring in part and dissenting in part) (noting that the

standard 4-part *prima facie* test is "[a]n example [where] the prima facie case gives rise

to only a weak inference of [age] discrimination"). Beyond this showing, Vance need

only point to some evidence, either direct or circumstantial, from which a factfinder

could reasonably either disbelieve VQ's explanation for his discharge or believe that

age discrimination was more likely than not a determinative cause of his firing. *Burton,*

707 F.3d at 427.

Vance has met this burden by introducing evidence of numerous age-related

remarks that were directed at him by Capper, one of the individuals involved in the

decision to terminate his employment.[6] Apart from the many written and verbal

comments outlined previously, both Vance and Perkins (Vance's one-time supervisor)

aver that Vance was subjected to a pattern of derision and antipathy by upper-level

management, which included references to Vance as a "dinosaur." (Doc. No. 43-5 at

pp. 2-3, ¶ 3; id. at p. 6-7, ¶¶15, 23; Doc. No. 44-6 at pp. 2-3, ¶¶ 7, 9.) Perkins states

that:

> [o]n more than one occasion, Paula Harper, Kenn Capper and Peter Renali [sic]
> [VQ's CEO] stated that Joseph Vance would never be promoted under "their watch."
> In their eyes, based on conversations with these individuals, they viewed Vance as a

---

[6] The record supports a finding that Capper, Harper, Mello, and Mehler all had input into VQ's decision to
discharge Vance. (See Harper Depo. at pp. 51-52 (Doc. No. 35-4 at p. 6); *see also* Statement of Paula
Mehler (Doc. No. 41-1 at p. 36) (stating that Capper, as state Director, would have been a "key individual"
involved in the termination decision).

"Dinosaur" whose time in the industry had "long passed." This was common knowledge in the VisionQuest program."

(Doc. No. 43-5 at p. 6, ¶ 15.) Vance asserts that, "[d]uring the last year of my employment at VisionQuest, Kenn Capper continuously made ageist comments and repeatedly told me that I was 'too old for the job' or the equivalent thereof. This continued well into the summer and fall of 2008." (Doc. No. 44-6 at p. 8, ¶ 34.)

For his part, Capper generally does not dispute making written and verbal remarks attributed to him by Vance and acknowledges that he "probably did" make the comment to Vance at some point that he was "too old to do his job." (Doc. No. 41-1 at pp. 27-28.) Although Capper characterizes these exchanges as good-natured, consensual banter, a jury faced with this record could reasonably conclude that Vance (the oldest Assistant Chief Administrator at the time) was uniquely targeted as the butt of such remarks and that they were unwelcome. Construing the evidence most favorably to Vance, it would hardly be unreasonable for a jury to construe Capper's remarks as direct evidence of age-related animus by an individual who had influence with respect to Vance's termination.[7]

With respect to the other evidence proffered by Vance in support of a finding of pretext – *i.e.,* comments made by CEO Peter Ranalli, VQ's disparate treatment of comparators, and alleged illogicalities in VQ's proffered reasons for termination – VQ disputes that any of these offerings are supportive of Vance's age discrimination claim.

---

[7] VQ points out that Capper is only three years younger than Vance and was involved in the decision to rehire Vance after his initial termination as well as the decision to promote Vance to Assistant Chief at the age of 53. However, to the extent these factors tend to rebut an inference of ageism on the part of Capper, they are for the jury to consider in light of the totality of circumstances in determining whether Vance was discharged on account of his age. On this record, considerations of Capper's age and prior involvement in Vance's promotions do not, as a matter of law, preclude a reasonable jury from finding that age discrimination was the "but-for" reason for Vance's termination.

VQ characterizes Ranalli's comments as mere stray remarks by a non-decisionmaker, for example, and denies that Vance's proffered comparators were similarly situated employees. Moreover, to the extent Vance takes issue with the disciplinary write-ups he received following his second "Special Evaluation," VQ insists this merely reflects Vance's disagreement with its business judgment. For present purposes, however, we need not resolve these various disputes because, even without consideration of Ranalli's comments, comparator employees, and/or the particulars of Vance's final Staff Notices, Vance has produced sufficient evidence of age discrimination to overcome summary judgment.

VQ nevertheless maintains that summary judgment is appropriate on the grounds that Vance has failed to allege or establish that age was the "but-for" cause of his termination. *See Gross v. FBL Fin. Servs.,* 557 U.S. 167, 177 (2009) ("under [29 U.S.C.] §623(a)(1), the plaintiff retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action"). VQ submits that: (1) in his Amended Complaint, Vance did not allege that his age was the "but-for" cause of his termination, but merely a "substantial factor"; (2) in his opposition to VQ's motion to dismiss, Vance alleged only that age was a "motivating factor" in his discharge; and (3) Vance agreed during his deposition testimony that age was a "substantial factor" in his termination. VQ insists that, under ruling of *Gross*, Vance's concessions fail the "but-for" standard and justify summary judgment in its favor.

The Court finds these arguments unpersuasive. To the extent VQ is attacking the manner in which Vance has pleaded his ADEA claim, we note that these proceedings are well past the Rule 12(b)(6) phase and, in any event, this Court would

27

be inclined to permit an amendment to the operative complaint such that it conforms to the evidence Vance has adduced in support of his claim. Insofar as Vance personally testified that age was a "substantial factor" in his termination, this Court is reluctant to dispose of his claim based on what amounts to a lay-person's understanding of a legal term of art.[8]

VQ further insists, however, that no showing of "but-for" causation can be made on this record inasmuch as Vance admits to the very conduct which led to his discharge. Although this somewhat overstates the point, Vance does at least appear to concede that, in the months following his second Special Evaluation: (a) a student under his watch absconded from the camp, despite regular body counts, (b) he left for home while the search for the missing student was still underway (due, he says, to the fact that he had worked a seventeen-hour day); (c) he left students alone and unsupervised for a brief period of time while attending to the needs of a co-worker who was being threatened by a youth;[9] (d) he turned off his radio in order to sleep despite being responsible for emergencies as the Senior Duty Officer; and (e) he uttered the phrase "fuck that bitch" in the presence of youth. At a minimum, VQ insists, these facts give rise to other termination-related factors which nullify any "but-for" causation.

---

[8] At his deposition, Vance agreed that age was a "substantial factor" in his termination; he also asserted that his whistleblowing reports motivated the decision. He specifically denied that poor performance or disciplinary write-ups played a role in his termination. (Doc. No. 35-2 at pp. 4-5.) Because the Federal Rules of Civil Procedure permit Vance to plead alternative legal theories, *see* Fed. R. Civ. P. 8(d)(3), we do not construe his deposition testimony as a binding admission which judicially estops him from asserting and attempting to prove but-for causation in his ADEA claim.

[9] VQ alleges that a student-on-student assault occurred during the time that Vance was out of the living unit, but the record would support a finding that there is a genuinely disputed issue of fact with regard to this allegation.

The Court does not agree. It is one thing for Vance to acknowledge that certain conduct on his part occurred; it is another to say that the conduct actually motivated the employer's decision to terminate him. The ultimate issue in this case is, of course, the intent of VQ's decision-makers. Vance may establish that they acted on an unlawful intent if he can prove, either by direct or by circumstantial evidence, that his age, rather than his conduct, actually drove the adverse decision. Casting doubt on the plausibility of VQ's claim that it fired Vance due to misconduct is one way for him to proceed, but it is not the only way. As we have noted, Vance can attempt to demonstrate but-for causation by pointing to evidence that more directly supports a finding of ageist intent. *See Burton,* 707 F.3d at 430-31 (a plaintiff may demonstrate pretext at the summary judgment stage either by pointing to evidence that would cause a reasonable juror to disbelieve the employer's articulated non-discriminatory reason or by pointing to evidence that indicates that the employer acted with discriminatory animus). Vance has done so by alleging numerous age-based comments on the part of Capper, who was a member of the decision-making team. Capper's remarks, taken as a whole, can reasonably be construed as reflecting a belief that Vance was unfit for his job on account of his age. Accordingly, we will deny VQ's motion for summary judgment as it pertains to Vance's ADEA claim premised upon his allegedly unlawful termination.

2. Vance's Hostile Work Environment Claim

Vance has also alleged that he was subjected to a hostile work environment on account of his age while employed at VQ.[10]  Defendant contends that this claim fails as a matter of law because (a) it is untimely and (b) Vance cannot demonstrate severe or pervasive harassment.  We are not persuaded that either of these bases can support an award of summary judgment.

a) *Is Vance's Harassment Claim Untimely*?

VQ first argues that Vance's ADEA claim premised on age-related harassment is time-barred.  To preserve such a claim, Vance must establish that at least one of the alleged acts of harassment occurred within 300 days of April 6, 2009 – the date on which Vance dual-filed his charge of discrimination with the Pennsylvania Human Relations Commission and the EEOC.  *See generally* 29 U.S.C. 626(d)(1)(B) (requiring, in relevant part, that the EEOC charge of discrimination be filed "within 300 days after the alleged unlawful practice occurred…").  *See also Ruehl v. Viacom, Inc.,* 500 F.3d 375, 382-83 (3d Cir. 2007) (noting that, in a "deferral state" like Pennsylvania, a judicial complaint will generally be dismissed for failure to exhaust administrative remedies if a supporting EEOC charge was not filed within 300 days of the allegedly illegal act).

VQ insists that Vance cannot meet this standard because, according to VQ, the most recent allegation of ageist harassment is an email sent by Capper on February 26, 2008, which was 405 days before Vance filed his charge.  Thus, VQ reasons, Vance's

---

[10] We will assume without deciding that the ADEA encompasses hostile work environment claims.  See *Whitesell v. Dobson Communication*, 353 Fed. Appx. 715, 717 (3d Cir. 2009); *Abraham v. Abington Friends School,* 215 Fed. Appx. 83, 85 (3d. Cir. 2006).

claim premised on age-related harassment must be dismissed for failure to exhaust his administrative remedies.

However, Vance alleges that the ageist harassment he suffered at the hands of Capper was continuous during the last year of his employment and occurred well into the summer and fall of 2008. (Doc. No. 44-6 at p. 8, ¶ 34.) This allegation, when credited (as it must be for Rule 56 purposes), is sufficient in light of the other evidence presented to establish the timeliness of Vance's hostile work environment claim. *See Cowell v. Palmer Tp.,* 263 F.3d 186, 292 (3d Cir. 2001) (Under the continuing violation doctrine, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period.") (citation omitted). S*ee also National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 117 (2002) (noting that a hostile work environment claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice"; therefore, such a claim is timely so long as "an act contributing to the claim occurs within the filing period") (Title VII case).

### b.) Did Vance Suffer From Age-Related Harassment That Was Unwelcome, "Severe," or Pervasive?

In order to establish a hostile work environment claim under the ADEA, a plaintiff must establish that: (1) he suffered intentional discrimination because of age; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person in the same position; and (5) respondeat superior liability exists. *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir.2006), *overruled in part on other grounds by Burlington Northern & Santa Fe*

*Ry. Co. v. White*, 548 U.S. 53 (2006); *Jenkins v. Knowledge Learning Corp.,* Civil Action No. 10–5058, 2013 WL 3465191 at *5 (D.N.J. July 10, 2013).  VQ argues that Vance cannot demonstrate an actionable hostile work environment based on ageist comments because the conduct of which he complains was neither unwelcome nor "severe" or "pervasive."

"To determine whether the comments were severe or pervasive, we evaluate 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance.'"  *Whitesell v. Dobson Communication*, 353 Fed. Appx. 715, 717 (3d Cir. 2009) (*quoting Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)).  Accordingly, a plaintiff pursuing a hostile work environment claim must show the workplace to be "'permeated with discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment.'"  *Harris v. Forklift Sys*., 510 U.S. 17, 21 (1993) (*quoting Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65–67 (1986)).

Citing the case of *Sosky v. International Mill Service, Inc.,* No. 94-2833, 1996 WL 32139 (E.D. Pa. Jan. 25, 1996), VQ argues that Vance's allegations of isolated conduct over a three-year period are insufficient as a matter of law to support a viable hostile work environment claim.  The plaintiff in *Sosky* claimed to have been subjected to numerous offensive remarks, which included his supervisor:

- commenting that "it's time to give the young a chance" because "the company needs to get some enthusiasm and drive," and further stating that the plaintiff

should be able to assist some newly promoted employees since he had "been around for a bunch of years";

- asking "how many birthdays do you have?" after the plaintiff had requested days off for his own birthday as well as the birthdays of two family members;

- writing the comment "are you going into semi retirement?" on the plaintiff's written request for end-of-year vacation days; and

- stating in regards to another employee that she "has been here a zillion years and can't change her work style."

1996 WL 32139 at *1-2. On other occasions, the plaintiff's supervisor had quipped that the plaintiff would need a 45-minute warning before meetings because he might be "out jogging or changing his oil," had told the plaintiff that he should not talk to people in the halls, had remarked "who gives a fuck?" in response to a workplace matter, and had yelled at the plaintiff to "wake up" during a luncheon, even though the plaintiff was not dozing off.

The district court in *Sosky* found that these various comments could not support a viable claim under the ADEA for workplace harassment. The court reasoned that many of the statements were facially unrelated to age and "the remaining comments [were] too few and too indirect to demonstrate either pervasive and regular discrimination or that a reasonable person of the same age as plaintiff and in plaintiff's position would have been detrimentally affected by these comments." 1996 WL 32139 at *9. The court noted that, in fact, the alleged hostile work environment "was so subtle" that, according to the plaintiff's own deposition testimony, he "did not realize that he had been the subject of age discrimination as opposed to unexplained fair treatment until he was actually terminated." Id. Accordingly, the court found that the plaintiff's hostile work environment claim could not survive summary judgment.

33

Arguing for a similar outcome in this case, VQ posits that Vance's three-year collection of allegedly offensive remarks consists of 19 documents, 17 of which involve comments that (according to VQ) were either provoked by Vance or are non-age-related. VQ insists this leaves only 2 comments over a three-year period which involve "some form of mild age humor." (Br. in Supp. of Def.'s Mot. for Summ. Judg. [Doc. No. 33] at p. 20.) VQ further insists that Vance has no evidence of receiving any ageist jokes for the eight months preceding his termination and never complained that he felt harassed or discriminated against. Finally, VQ maintains that Vance engaged in the same type of banter that he now characterizes as unlawful harassment and, therefore, the record cannot support a finding of harassment that was either objectively or subjectively hostile.

VQ's various arguments fail to establish grounds for summary judgment. Contrary to VQ's characterization of the evidence, the record before me could support a finding of more than just two unsolicited comments over a three-year period involving mild age-based humor. The Court has previously delineated a number of comments which were directed to Vance either verbally or in writing between December 2005 and July of 2008. Although not all of the comments are overtly ageist, their general theme when construed as a whole is that Vance's mental and physical prowess and – by extension, his ability to adequately perform his job -- was deteriorating as a result of his advancing age. Even many of the remarks which on the surface pertain primarily to Vance's alleged weight gain could be construed, on this record, as in line with that general theme, as Capper made numerous comments suggesting that Vance was becoming bloated and/or physically weak with age. In the context of Vance's

34

employment, which involved daily interaction with teen-aged male offenders, the suggestion that Vance was becoming out of shape and/or physically weak with age could reasonably be viewed as an insinuation that Vance was too old to perform his job and, in fact, the record supports a finding that Capper directly told Vance as much on numerous occasions.[11] Further corroborative support for Vance's harassment claim is found in Perkin's averment that Vance was the target of derision and that he was openly referred to as a "dinosaur." In sum, the Court cannot agree with VQ's assessment that the evidence in this case falls "woefully short of the legal standard for an actionable hostile work environment." (Def.'s Br. in Supp. of Mot. for Summ. Judg. [Doc. No. 33] at p. 20). Accordingly, VQ's reliance on *Sosky* is inapposite.

VQ also insists that Vance's hostile work environment claim is undermined by his failure to have complained about the alleged harassment. However, this record gives rise to a legitimate dispute as to whether Vance did in fact object to this treatment and what inference, if any, should be drawn from his failure to object more vociferously. Vance has testified that he complained to Capper about this treatment and directed him to stop it on at least two occasions. (Doc. No. 35-2 at pp. 11.) He claims that Capper's response was that, "if you don't like it, McDonald's is always hiring." (Id.) Vance has also testified that he was reluctant to approach higher management because Capper had instructed his subordinates never to deviate from the chain of command and because Vance perceived that other VQ employees who did go outside the chain of command with complaints about their supervisors suffered retribution. (Id. at pp. 11-12;

---

[11] Vance's assertion that Capper repeatedly made ageist comments and told him he was "too old for the job" (or the equivalent thereof) well into the summer and fall of 2008, although disputed by VQ, is credited for present purposes and is in contravention to VQ's claim that Vance has not presented any evidence of ageist comments during the eight months preceding his termination.

Doc. No. 44-6, ¶ 22, pp. 4-5.) Whether this testimony should be credited is for the jury to determine.

Similarly, the extent to which Vance participated in this so-called "banter" and the degree to which such behavior was welcomed or unwelcomed by him are matters for the jury to decide. To be sure, the record could support a finding that Vance participated in these exchanges to a limited extent; for example, Vance does not deny that he wrote the note wherein he refers to Capper as "Little Kenny" and advises Capper that, if he trained hard and took his vitamins, he might "grow up to be big and strong like [his] Uncle Joe." (Doc. No. 35-2 at p. 71.) On the other hand, the record does not compel the conclusion that Vance welcomed or actively solicited the substantial number of offensive communications he claims to have received.[12] In addition, a jury could reasonably construe Vance's comments as relatively innocuous and less frequent; by contrast, a jury could reasonably view Capper's comments as substantially more personal, offensive, and demeaning, especially in view of the fact that Capper held supervisory authority over Vance.

Accordingly, this Court finds that the evidence, when viewed most favorably to Vance, could reasonably support a determination that Vance was subjected to unwelcomed age-related harassment severe and pervasive enough to constitute a hostile work environment. VQ's motion for summary judgment will therefore be denied as to this claim.

---

[12] We note, for example, that there is a disputed issue of material fact relative to whether Vance invited Capper's May 16, 2007 email which was written in response to a picture Vance had brought to work depicting himself as a younger man running in shorts. According to Vance, he brought the picture in to show Harper but did not intend for Harper to circulate the picture among Vance's co-workers.

3. <u>Limitations on Vance's Claim for Damages</u>

Finally, with respect to Vance's ADEA claim, VQ argues that any award of damages must be limited to the time period ending with Vance's deposition. Citing the "after-acquired evidence" doctrine, VQ maintains that any damages accruing from the time of Plaintiff's deposition should be barred because VQ discovered for the first time at Vance's deposition that he had misrepresented his academic credentials and had lied about his prior work experience in order to hide a previous felony drug conviction – misrepresentations which, according to VQ, would have resulted in his immediate termination from employment.

Such after-acquired evidence is not relevant on the issue of liability but may be relevant on the issue of remedies where an employer can establish that "the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 362-63 (1995). If the employer "proves that it would have terminated the plaintiff's employment for the reason revealed by the after-acquired evidence," then the plaintiff's recovery is limited to backpay running from the discharge to the time that the wrongdoing was discovered. *Mardell v. Harleysville Life Ins. Co.,* 65 F.3d 1072, 1073-74 (3d Cir. 1995).

Here, VQ has submitted the affidavit of James Yester, Vice President of Human Resources for VQ, who avers that he "would have directed [VQ] to fire Vance if we had learned of his many misrepresentations on his employment application and resume while he was still employed here." (Doc. 35-6 at p. 3, ¶ 6.) Yester further states that "[t]erminating an employee for providing false information is consistent with [VQ] policy."

(Id.)  The portion of VQ's employee handbook referred to by Yester includes language stating that "[f]alsifying employment or other Company records" is considered a serious offense and "may be grounds for immediate termination."  (Doc. No. 35-6 at p. 6.)

Vance contends that the issue as to whether he should be limited in his damages is one for the jury, and we agree.  Vance has testified that he fully disclosed his criminal history to a VQ human resources representative by the name of John Brown at the time of his initial interview and hire.  Vance further attests that he signed numerous release papers during his tenure which would have granted VQ access to his full criminal history.  Accordingly, on this record there is a disputed issue of fact at least as to whether Vance "misrepresented" or "falsified" his criminal background and his employment history.  VQ's motion for summary judgment will therefore be denied to the extent it seeks to limit Vance's claim for damages under the ADEA.

## B.

We next consider Vance's claim that his termination violated the Pennsylvania Whistleblower Law.  With respect to this claim, Vance alleges that he was discriminated against as a result of complaints he made concerning VQ's failure to comply with mandatory staff-to-student ratios.

VQ has moved for summary judgment on several bases.  First, VQ claims that it is not subject to the Whistleblower Law because it is not a "public body" within the meaning of the statute.  Second, VQ contends that Vance cannot make out a *prima* facie case under the Whistleblower Law because he cannot show (a) that he made a good faith report of waste or wrongdoing or (b) that his termination was causally related to his complaints about understaffing.  Finally, VQ maintains that, even if Vance could

38

establish a *prima facie* case under the statute, VQ has established as a matter of law that it would have taken the same action for separate and legitimate reasons – namely, Plaintiff's poor performance and lack of professionalism.

We agree that the record here cannot support a reasonable finding that Vance's complaints about staffing were the cause of his termination. Because this conclusion is dispositive of Vance's whistleblower claim, we need not address VQ's remaining arguments in favor of summary judgment.

Pennsylvania's Whistleblower Law, Act of December 12, 1986, P.L. 1559, 43 P.S. §§ 1421–1428, prohibits an employer from discriminating or retaliating against an employee regarding the employee's "compensation, terms, conditions, location or privileges of employment" because of the employee's "good faith report of wrongdoing or waste." 43 P.S. § 1423(a). The Law imposes upon the plaintiff the burden of showing by a preponderance of the evidence that, prior to the alleged reprisal, the plaintiff had made, or was about to make, a good faith report of wrongdoing or waste. *Id.* at § 1424(b).

This showing encompasses a requirement that the plaintiff "come forward with some evidence of a connection between the report of wrongdoing and the alleged retaliatory acts." *O'Rourke v. Commonwealth*, 778 A.2d 1194, 1200 (Pa. 2001) (*citing Golaschevsky v. Com., Dept. of Environmental Protection*, 720 A.2d 757, 759 (Pa.1998)). *See also Callaghan v. Haverford Township*, 345 Fed. Appx. 767, 771 (3d Cir. Sept. 21, 2009) (citing *O'Rourke, supra*). This connection "may not be predicated upon 'vague and inconclusive circumstantial evidence.'" *Sea v. Seif*, 831 A.2d 1288, 1293 n. 5 (Pa. Commw. 2003) (*quoting Golaschevsky*, 720 A.2d at 759). Rather, a

plaintiff must "'show by concrete facts or surrounding circumstances that the report [of wrongdoing or waste] led to [the plaintiff's] dismissal, such as that there was specific direction or information received not to file the report or [that] there would be adverse consequences because the report was filed.'" *Golaschevsky*, *supra,* at 759 (*quoting, with approval, Gray v. Hafer*, 651 A.2d 221, 225 (Pa. Commw. 1994)) (alterations in the original). *See also Wei v. State Civil Service Commission,* 961 A.2d 254, 260 (Pa. Commw. 2008) (*citing Gray, supra*).

In this case, the record cannot reasonably support a causal connection between Vance's reports of wrongdoing and the retaliation to which he was allegedly subjected. Vance contends that, although VQ employees were instructed not to report ratio violations to the Pennsylvania Department of Public Welfare, he nevertheless made complaints to David Majcher, a DPW employee. Vance further alleges that DPW cited VQ for ratio violations and discussed the violations with Harper and Capper at or around the time of Vance's reports. However, the record here is devoid of any evidence inferentially connecting Vance's report to his termination. Vance cites to a portion of Majcher's deposition testimony indicating that he (Vance) inquired about whether VQ's practices with respect to its use of a night watch supervisor and on-call overnight administrator constituted a violation of state regulations. (Doc. No. 44-4 at pp. 7-8.) Majcher opined that VQ's practices in this regard did not violate state regulations; more importantly, however, Majcher testified that he did not have any conversations with personnel at VQ concerning Vance's inquiry until *after* Vance's termination. (Id. at p. 16.) Accordingly, the record does not support a finding that Vance's complaints to Majcher resulted in his termination.

Vance has offered evidence that he made complaints about staffing internally within the company. According to Perkins, he and Vance (along with Mello) on several occasions raised concerns about lack of proper staffing directly to upper level management – including during meetings with Harper and Capper. (Doc. No. 43-5 at p. 5, ¶ 13.) Vance personally testified to having raised the issue with Harper in May 2007 and/or the summer of 2008. (Doc. No. 35-2 at pp. 21, 62.) He further claims to have reported ratio problems to Van Ness "on nearly a daily basis." (Doc. 44-6 at p. 4, ¶ 21.)

This evidence is also insufficient to support a reasonable finding that Vance's complaints were the reason for his termination. An inference of causation premised solely on the passage of time is generally insufficient to establish liability under the Pennsylvania Whistleblower Law. *Golaschevsky v. Com., Dept. of Environmental Protection,* 683 A.2d 1299, 1304 (Pa. Commw. 1996); *Gray,* 651 A.2d at 225. Such an inference is particularly untenable here, though, because the record is replete with evidence that (a) staffing shortages were a consistent, well known problem at the Franklin campus and (b) complaints about understaffing were rampant among VQ employees. No argument or evidence has been presented to the court that would support a finding that Perkins or Mello suffered retribution on account of their complaints about understaffing, nor are we in a position to infer that Vance's complaints to VQ management were qualitatively different or more frequent than the complaints VQ was receiving from other employees. Insofar as Vance claims to have made reports of ratio violations to Van Ness, we note that Van Ness is not alleged to have been connected to the decision-making process that resulted in Vance's discharge.

Accordingly, we conclude that the record cannot support a reasonable finding that Vance's complaints about under-staffing were the reason for his termination. Because Vance cannot satisfy this element of his prima facie case, his claim under the Pennsylvania Whistleblower Law cannot withstand summary judgment.

### IV.    CONCLUSION

Based on the foregoing reasons, we will deny VQ's motion for summary judgment with respect to Vance's claims under the ADEA and PHRA for alleged age-discrimination. We will grant VQ's motion with respect to Vance's claim under the Pennsylvania Whistleblower Law.

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JOSEPH VANCE,                          )
                                       )
                   Plaintiff,          )        Case No.  1:09-cv-284-SJM
                                       )
          v.                           )
                                       )
VISIONQUEST NATIONAL, LTD.,            )
                                       )
                   Defendant.          )


# O R D E R

AND NOW, to wit, this 1st Day of August, 2013, for the reasons set forth in the

accompanying Memorandum Opinion,

IT IS ORDERED that Defendant's Renewed Motion for Summary Judgment [66]

shall be, and hereby is, DENIED in part and GRANTED in part as follows:

1. Said motion is DENIED with respect to Plaintiff's claims under the Age
   Discrimination in Employment Act  and the Pennsylvania Human Relations
   Act, as set forth in Counts I and III of the Amended Complaint; and

2. Said motion is GRANTED with respect to Plaintiff's claim under the
   Pennsylvania Whistleblower's Law, as set forth in Count II of the Amended
   Complaint.


IT IS SO ORDERED.


                                       s/    Sean J. McLaughlin

                                       Sean J. McLaughlin
                                       Chief U.S. District Judge

cm:    All counsel of record.